# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

Nº 12-CV-2620 (JFB) (ARL)

————————————————

THOMAS FERREIRA,

Plaintiff,

VERSUS

TOWN OF EAST HAMPTON, DOMINIC SCHIRRIPPA, MADELEINE NARVILAS, JOHN JILNICKI, KENNETH GLOGG, THOMAS GRENCI, WILLIAM MCGINTEE, JULIA PRINCE, PETE HAMMERLE, BRAD LOEWEN, AND PAT MANSIR, IN THEIR OFFICIAL CAPACITIES AND INDIVIDUALLY,

Defendants.

————————————————

**MEMORANDUM AND ORDER**
November 4, 2014

————————————————

JOSEPH F. BIANCO, District Judge:

On June 22 and September 14, 2009, individuals acting at the direction of the Town of East Hampton (the "Town") entered plaintiff Thomas Ferreira's ("plaintiff" or "Ferreira") property located at 63 Navy Road in Montauk, New York (the "Property") and removed many unregistered and inoperative vehicles, tools, and other items. The Town was acting pursuant to two resolutions passed by the Town Board directing the removal of "litter," as that term is defined by Chapter 167 of the Town Code, from the Property.

In response to those events, plaintiff brings this action against the Town and individual defendants Dominic Schirrippa ("Schirrippa"), Madeleine Narvilas ("Narvilas"), John Jilnicki ("Jilnicki"), Kenneth Glogg ("Glogg"), Thomas Grenci ("Grenci"), William McGintee ("McGintee"), Julia Prince ("Prince"), Pete Hammerle ("Hammerle"), Brad Loewen ("Loewen"), and Pat Mansir ("Mansir"), in their official and individual capacities. He asserts the following constitutional claims pursuant to 42 U.S.C. § 1983: (1) the Town resolutions were unconstitutional bills of attainder; (2) he was deprived of his property without due process of law; (3) he was subjected to unreasonable searches and seizures, in violation of the Fourth Amendment; (4) the deprivation of his property constituted a violation of his substantive due process rights; and (5) he was treated differently from others similarly situated to himself, in violation of the Equal

1

Protection Clause of the Fourteenth Amendment.[1]

All defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motions are granted in part and denied in part. First, the Court grants summary judgment for all defendants as to plaintiff's bill of attainder claim because the Town Board resolutions at issue, which authorized the removal of litter, did not impose the necessary "punishment" for the resolutions to constitute bills of attainder. Authorizing the removal of litter or the abatement of a public nuisance is a legitimate, nonpunitive, regulatory measure. Second, with respect to plaintiff's procedural due process claim, the Court holds that the conceded absence of a pre-deprivation hearing would constitute a due process violation unless the defendants could demonstrate the existence of an emergency. In the instant case, construing the evidence most favorably to plaintiff (including the fact that defendants knew about the conditions on the Property for many years), there is sufficient evidence to create a genuine issue of disputed fact as to whether defendants, in the absence of an emergency, abused their discretion by conducting the removals before giving plaintiff an opportunity to be heard. Accordingly, the procedural due process claim must proceed to trial. Third, the Court rejects plaintiff's contention that the Town needed a warrant in order to execute the removals. However, the Court also concludes that the reasonableness of the removals depends in part upon whether they were conducted in conformity with due process—a disputed issue at this juncture. Moreover, there are disputed issues of fact as to whether plaintiff's tools and other non-litter were removed from the Property, which goes to the reasonableness of the manner in which the searches and seizures were conducted. Accordingly, plaintiff's Fourth Amendment claim must also proceed to trial. Fourth, the Court grants summary judgment for all defendants as to plaintiff's substantive due process claim because it is duplicative of his Fourth Amendment claim. Fifth, the Court holds that the class-of-one equal protection claim cannot survive summary judgment. In brief, plaintiff has failed to present evidence from which a reasonable jury could find that he was similarly situated to other properties that, he claims, kept vehicles outdoors without the Town's interference.

In sum, plaintiff has established triable issues of fact as to whether his procedural due process and Fourth Amendment rights were violated. With respect to the respective defendants' liability for those violations, first, the Town may be held liable because all relevant actions were authorized by the Town Board and can thus be considered municipal policy. Defendants Prince, Hammerle, Loewen, McGintee, and Mansir are, however, entitled to absolute legislative immunity because their sole involvement in this case stems from their votes as members of the Town Board. Finally, the Court grants Schirrippa, Narvilas, Jilnicki, Glogg, and Grenci's motion for summary judgment on the basis of qualified immunity. None of the rights plaintiff invokes are clearly established law; in fact, plaintiff has pointed to other court decisions under similar factual circumstances, which seem to support the legality of the defendants' actions in this

---

[1] In his memorandum in opposition and response to the Town's Rule 56.1 Statement of Facts, plaintiff withdraws the following, additional claims raised in the amended complaint: (1) a Fifth Amendment takings claim (*see* Pl.'s Opp'n, at 24); (2) all Sixth Amendment claims (*see id.*); and (3) a state-created danger claim (*see* Pl.'s Response to Town's 56.1 ¶¶ 514–39). Accordingly, the Court dismisses these claims pursuant to Federal Rule of Civil Procedure 41(a)(2).

case. Thus, the Court grants summary judgment for Schirrippa, Narvilas, Jilnicki, Glogg, and Grenci on qualified immunity grounds. As a result of this Memorandum and Order, only plaintiff's procedural due process and Fourth Amendment claims against the Town survive summary judgment.

## I. BACKGROUND

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmoving party. *See, e.g.*, *Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed, or the opposing party has not pointed to any evidence in the record to contradict it.[2]

The Property at issue sits on just under one-quarter of an acre facing Fort Pond Bay in Montauk. (SS 56.1 ¶¶ 2, 18; DSB 56.1 ¶¶ 2–3.[3]) It has been in plaintiff's family since 1948, and plaintiff began living there permanently in 1995. (SS 56.1 ¶¶ 1, 21–36, 38–40, 55; DSB 56.1 ¶¶ 1, 4–8.) The Property has been zoned "A Residential" since 1982. (SS 56.1 ¶¶ 2, 54; DSB 56.1 ¶ 14.) It contains a "pre-existing non-conforming repair garage as defined by the East Hampton Town Code." (SS 56.1 ¶ 67; *see id.* ¶¶ 70–76; DSB 56.1 ¶¶ 15–16.) It does not include a pre-existing, non-conforming recycling and scrap yard. (SS 56.1 ¶¶ 220–21.)

Plaintiff, a self-employed automobile mechanic, has operated his auto repair business from the Property since 2001. (SS 56.1 ¶¶ 57–62; DSB 56.1 ¶¶ 18, 23.) He has also operated a taxi business and a towing business out of the Property. (SS 56.1 ¶ 91; DSB 56.1 ¶¶ 11, 24–26.) Plaintiff received a Town business permit to operate a "light" repair garage on October 25, 2007, although

---

[2] Although the parties' respective Rule 56.1 statements of facts contain specific citations to the record, the Court cites to the Rule 56.1 statement instead of the underlying citation to the record where possible. The Court notes that plaintiff's counsel has failed to comply with Local Rule 56.1 in that he has not submitted a Rule 56.1 statement of fact that includes "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party"; instead, plaintiff's Rule 56.1 statement responds to only a portion of defendants' Rule 56.1 statements. However, plaintiff's submissions make clear which evidence he is citing to respond to defendants' 56.1 statements. Thus, plaintiff's non-compliance with the local rule has not prejudiced the defendants, and the Court, in its discretion, overlooks plaintiff's failure to fully comply with the local court rules. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with

local court rules.") (citations omitted); *see also Capellupo v. Nassau Health Care Corp.*, No. 06–CV–4922 (JFB), 2009 WL 1705749, at *1 n. 3 (E.D.N.Y. June 16, 2009) (excusing defendant's failure to include record citations in Rule 56.1 statement, where appropriate record citations were included elsewhere in attorney's submissions); *cf. Williams v. R.H. Donnelley, Inc.*, 199 F.Supp.2d 172, 174 n. 1 (S.D.N.Y.2002) (excusing failure to submit statement pursuant to Local Civil Rule 56.1 where the facts were set forth in the party's memorandum of law).

[3] "SS 56.1" refers to the Rule 56.1 Statement submitted by Sokoloff Stern LLP on behalf of the Town, McGintee, Prince, Hammerle, and Loewen. "DSB 56.1" refers to the Rule 56.1 Statement submitted by Devitt Spellman Barrett, LLP on behalf of Schirrippa, Grenci, Narvilas, Jilnicki, and Glogg. Mansir "adopts all factual statements provided in the Rule 56.1 Statement submitted by [Sokoloff Stern LLP]." (Mansir 56.1 ¶ 1.)

that permit expired one year later, and he did not renew the permit until January 23, 2009. (SS 56.1 ¶¶ 77–79.) He first registered his repair shop at the Property with the New York State Department of Motor Vehicles on April 22, 2009. (*Id.* ¶ 81.) Plaintiff has never been licensed to operate a junk, recycling, or scrap yard on the Property. (DSB 56.1 ¶¶ 17, 42.)

Over the years, plaintiff stored many unregistered and inoperative vehicles, some of which he was storing for customers, on and near the Property. (*See* SS 56.1 ¶¶ 116–217, 225–50.) As a result, numerous charges of violating the Town Code and New York State law were filed against him. In 2008 and 2009 alone, the Town issued twelve informations charging plaintiff with operating an unauthorized "recycling and scrap yard." (*Id.* ¶¶ 305–67; DSB 56.1 ¶ 104.) Plaintiff concedes that he kept more than three unregistered vehicles on the Property—the definition of a "recycling and scrap yard" under Town Code § 255-1-20—on all relevant dates. (SS 56.1 ¶¶ 308–65; DSB 56.1 ¶ 105.) During the same time period, plaintiff was also charged multiple times with erecting and operating a forty-foot antenna without a permit or a certificate of occupancy. (SS 56.1 ¶¶ 314–70; DSB 56.1 ¶ 106.) He pleaded guilty to these charges. (*Id.*) Plaintiff was also charged several times with violations of the New York State Property Maintenance Code for having more than two inoperative or unregistered motor vehicles in a state of disassembly or disrepair. (SS 56.1 ¶¶ 314–70; DSB 56.1 ¶ 107.) Plaintiff admits to this. (*Id.*)

Plaintiff contested many of these charges in the Town Justice Court beginning in 2008. (SS 56.1 ¶ 478; *see* DSB 56.1 ¶¶ 109–15.) Both plaintiff's attorney, Austin Manghan ("Manghan"), and Narvilas, a lawyer for the Town, requested a trial. (SS

56.1 ¶¶ 486, 492; DSB 56.1 ¶ 113.) The Town Justice Court adjourned the case numerous times—always at the request of plaintiff's counsel—in 2008 and 2009. (*See* SS 56.1 ¶¶ 478–502; DSB 56.1 ¶¶ 109–15.)

In the meantime, the state of the Property was being discussed regularly at meetings of the Montauk Citizen Advisory Committee and the Town Litter Committee. (SS 56.1 ¶ 254; DSB ¶ 64.) On May 6, 2009, thirty-nine Montauk residents signed a petition asking the Town to clean up the Property. (*See* Radi Decl. Ex. OOO.)

The next day, Town Chief Fire Marshal Michael Johnson ("Johnson") asked Assistant Chief Fire Marshal James Dunlop ("Dunlop") to inspect the Property. (SS 56.1 ¶ 372.) Dunlop inspected the thirty-five by thirty-five feet area "where [plaintiff] repaired his cars" on May 15, 2009. (Dunlop Dep. at 106.) He found only one violation of the Fire Code: a fire extinguisher overdue for service. (*Id.* at 179.) According to Johnson, however, Dunlop reported no violations, and Narvilas directed Johnson to re-inspect the Property. (Johnson Aff. ¶¶ 4–5.) Johnson did so himself on May 26, 2009. (SS 56.1 ¶ 381.) During Johnson's inspection, he observed "numerous old, rusted, dilapidated automobiles" and rusted propane gas tanks on the Property. (*Id.* ¶¶ 382, 284.) He sent a memorandum documenting his findings to Narvilas on May 26, 2009. (*Id.* ¶ 386.) Johnson's memorandum included his opinion "that the existing conditions at [the Property] [were] not in compliance with various chapters of the Code of the Town of East Hampton, and various sections of the Property Maintenance Code of New York State." (Radi Decl. Ex. 5E.)

On June 1, 2009, Glogg, a Town Code Enforcement Officer, issued a similar report to the Town Board indicating that he had

observed "numerous abandoned, dilapidated, unregistered motor vehicles" during his inspection of the Property in February 2008, and "15 abandoned, dilapidated, unregistered motor vehicles, a travel trailer, two boats, tires, a propane tank and other assorted car parts and debris" during his inspection of the Property in February 2009. (SS 56.1 ¶¶ 395–96; DSB 56.1 ¶¶ 124–25; Radi Decl. Ex. VV.) Glogg recommended to the Town Board that the Property "should be cleared immediately pursuant to East Hampton Town Code Section 167-12." (Radi Decl. Ex. VV; *see* SS 56.1 ¶ 403; DSB 56.1 ¶ 124.)

In a letter dated May 20, 2009, and mailed to plaintiff and Narvilas, the Town's Chief Building Inspector opined that "any vehicle left on the property more than 60 days is not being repaired diligently and would therefore be considered refuse pursuant to Section 167 of the Town Code." (Radi Decl. Ex. 5F.) Plaintiff "is uncertain as to provenance of a May 20, 2009 document in light of the alteration to the Fire Marshal documents of June 17, 2009 and suppression of earlier Dunlop letter" (Pl.'s Response to SS 56.1 ¶ 393), which the Court discusses *infra*.

On June 10, 2009, Narvilas informed plaintiff via registered mail that "the East Hampton Town Board has decided, pursuant to Town Code Section 167-12, to effect the clearing of any items on your property which have been deemed by the Town to be dangerous to the public health, safety or welfare." (Radi Decl. Ex. 5G; *see* SS 56.1 ¶ 425; DSB 56.1 ¶¶ 136–37.) In fact, as noted *infra*, the Town Board had not yet taken any action concerning the Property. Narvilas's letter referenced "seventeen inoperable, unlicensed, unregistered and abandoned cars, a wooden carport with rotting boards, inoperable boats, tires, engines, a large metal shed overflowing with construction debris, outboard motors, plastic crates, household items and other litter." (Radi Decl. Ex. 5G.) She also advised plaintiff that "upon your failure, neglect or refusal to dispose properly of the litter contained on your properties within ten (10) days, the Town, its agent, or other designated agent is authorized and empowered to enter your property to dispose of such litter." (*Id.*) Plaintiff received the letter the next day. (SS 56.1 ¶ 426.)

Two different letters were then sent to plaintiff regarding Dunlop's May 15 inspection. A letter dated June 16, 2009, and signed by Dunlop memorialized Dunlop's finding regarding the fire extinguisher. (*See* Radi Decl. Ex. 5B.) A second letter dated June 17, 2009, and purportedly signed by Dunlop stated that the inspection revealed "No Violations of the State and Local Code." (Radi Decl. Ex. 5C.) The June 17 letter also contained the following sentence: "Be advised that this inspection was based on the Fire Code of New York State and not the Property Maintenance Code which is enforced by the Code Enforcement Department." (*Id.*) Johnson inserted this sentence, at Narvilas's instruction to "insert qualifying language," before giving the letter to Dunlop to sign. (Johnson Aff. ¶¶ 10–11.) Dunlop testified that he did not believe the signature on the June 17 letter was his, although he accepted the possibility that he had signed the letter without reading it. (Dunlop Dep. at 167–68, 181, 186–87.)

Johnson wrote a second memorandum to Narvilas on June 18, 2009, recommending that the Town clear the Property pursuant to Town Code § 167-12 because of the danger posed by "numerous flammable and combustible liquids from the abandoned vehicles on the property." (SS 56.1 ¶¶ 419–20.) Johnson's memorandum also suggested that "no positive inferences regarding the above situation should be drawn from the

June 17, 2009 report" purportedly signed by Dunlop because Dunlop's inspection concerned only the Property's "repair area." (*Id.* ¶¶ 423–24; *see* Radi Decl. Ex. 5H.)

At a meeting of the Town Board that was open to the public on June 18, 2009, the Town Board unanimously passed a resolution finding that the condition of the Property violated Chapter 167 of the Town Code, and that plaintiff had been given notice of this violation by Narvilas's June 10 letter. (SS 56.1 ¶ 427; DSB 56.1 ¶¶ 138–140; Radi Decl. Ex. 5J.) The resolution authorized the Town to clear the Property of litter in the event that plaintiff failed to do so himself within ten days of receiving Narvilas's letter. (Radi Decl. Ex. 5J.)

After receiving Narvilas's letter, plaintiff's lawyer, Manghan, sought to enjoin the Town from proceeding with the scheduled removal. (SS 56.1 ¶¶ 430–33; DSB 56.1 ¶ 146.) Manghan informed Narvilas that he intended to file an order to show cause in the Supreme Court of the State of New York on June 17—the Wednesday before the scheduled removal date of Monday, June 22. (DSB 56.1 ¶ 149.) Narvilas asked Manghan to wait to file the order to show cause so that she could attend her daughter's pre-school graduation. (*Id.*) Manghan thus waited until Friday, June 19, to go to court. (*Id.* ¶ 150; SS 56.1 ¶¶ 430–33.) When he arrived in court with his papers on June 19, however, a court clerk informed him that his paperwork was deficient. (SS 56.1 ¶¶ 431–32; DSB 56.1 ¶ 152.) Narvilas and Jilnicki, the Town Attorney, denied Manghan's request to put off the removal for one additional day so that he could correct the paperwork. (DSB ¶ 153.)

Sometime before June 22, plaintiff removed two vehicles from the Property and stored them at Lindy's Taxi in Montauk. (*Id.* ¶ 434; DSB 56.1 ¶ 154.)

On June 22, 2009, several private companies entered the Property and removed numerous unregistered vehicles and other debris. (SS 56.1 ¶¶ 435, 440.) Grenci, a sergeant in the Town Police Department, was at the scene and told plaintiff, "If you interfere, I will place you under arrest." (DSB 56.1 ¶ 169.) Among the vehicles seized were approximately five unregistered taxis (*id.* ¶¶ 187–99; *see* Ferreira Dep. at 330), between two and four vehicles that plaintiff was storing for customers (DSB 56.1 ¶ 213; *see* Ferreira Dep. at 345–47), an unregistered Ford flatbed tow truck to which plaintiff held legal title (DSB 56.1 ¶¶ 225–26; *see* Ferreira Dep. at 218–19, 258–59), and an unregistered blue tow truck (DSB 56.1 ¶ 241; *see* Ferreira Dep. at 689–90). Plaintiff claims that the vehicles were stacked on top of each other and "crushed" in front of him. (SS 56.1 ¶ 436; DSB 56.1 ¶ 177.) He also testified that the Town removed an operable forklift that he had used for repairing cars, twenty to thirty tires that were stored outside in a pile, two-way radios, barbeques, hoses, rakes, hand tools, and ladders. (Ferreira Dep. at 397, 694–95.) At least nine vehicles, the trailer, and boats were not removed on that day. (SS 56.1 ¶¶ 441–42.)

After the June 22 removal, on July 13, 2009, Schirrippa, the Director of Code Enforcement, wrote a memorandum to the Town Board indicating that plaintiff "began storing additional unregistered motor vehicles on his property" the day after the June 22 removal. (SS 56.1 ¶ 455; DSB 56.1 ¶ 132; Radi Decl. Ex. 5S.) Schirrippa issued a second memorandum to the Town on August 14, 2009, indicating that plaintiff had brought back the two vehicles stored at Lindy's Taxi, and that as of July 13, 2009, he had "accumulated six (6) unregistered

motor vehicles and trailers" on the Property. (SS 56.1 ¶ 457; DSB 56.1 ¶ 132; Radi Decl. Ex. 5U.) Plaintiff denies that he brought back the two vehicles from Lindy's before the second removal. (Ferreira Dep. at 482–83.)

Plaintiff's case in the Town Justice Court remained pending at this time. On August 17, 2009, the Town Justice Court scheduled a pre-trial conference for September 21, 2009, and set a trial date of October 27, 2009. (SS 56.1 ¶¶ 499–500; DSB 56.1 ¶ 115.)

At a meeting of the Town Board that was open to the public on August 20, 2009, the Town Board unanimously passed a second resolution finding that the condition of the Property violated Chapter 167 of the Town Code. (SS 56.1 ¶ 459; DSB ¶ 157–58; Radi Decl. Ex. 5W.) The resolution gave plaintiff ten days from the date of notification to clear the Property of all litter in violation of Town Code 167-12, and it authorized the Town "to remove the litter and to otherwise bring the property into conformance with the standards of Chapter 167 after the expiration of the 10 day notification." (Radi Decl. Ex. 5W.) By letter dated August 21, 2009, and sent to plaintiff via registered mail, Jilnicki informed plaintiff of the Town Board's resolution and advised him "to dispose properly of the litter" on the Property within ten days. (SS 56.1 ¶ 462; DSB 56.1 ¶¶ 160–61; Radi Decl. Ex. 5X.) The Town Clerk also sent plaintiff a letter dated August 21, 2009, notifying him that the Town had passed the August 20, 2009 resolution. (SS 56.1 ¶ 466.) Plaintiff testified that he did not receive Jilnicki's August 21 letter until months later, although he acknowledged that the letter had been sent to the correct post office box. (*See* Ferreira Dep. at 725, 743.)

The second removal took place on September 14, 2009. (SS 56.1 ¶ 467; DSB 56.1 ¶ 178.) On that day, private companies removed four to five unregistered vehicles, two unregistered boat trailers, and an inflatable raft. (SS 56.1 ¶ 467; DSB 56.1 ¶¶ 281–83.) Plaintiff also testified that six serviceable engines were taken from his garage, and that power tools, hand tools, and newly purchased car parts had been inside one of the removed vehicles. (Ferreira Dep. at 724.) Four or five vehicles, two boats, and the trailer were not removed. (SS 56.1 ¶¶ 469–71; *see* Ferreira Dep. at 733.)

On October 14, 2009, plaintiff pleaded guilty to some of the charges against him, including a violation of Town Code § 167-10, in the Town Justice Court. (SS 56.1 ¶ 502; DSB 56.1 ¶ 117.)

Each removal cost $9,850, and those costs were added to plaintiff's Town property tax bill. (SS 56.1 ¶ 473; Radi Decl. Ex. 6A.) Plaintiff did not pay (Ferreira Dep. at 739), and the Town Board voted to put a tax lien on the Property (*id.* at 781–82). Mansir, a member of the Town Board, voted against the resolution to put a lien on the Property, although she had voted in favor of the resolutions of June 18 and August 20, 2009. (DSB 56.1 ¶ 298.) When plaintiff spoke to Mansir sometime after the two removals, she told him that she would not have voted for those resolutions had she known that plaintiff's repair garage was a pre-existing non-conforming use and that he had licenses from the Town and the State to operate a repair garage. (*Id.* ¶ 299.) According to plaintiff, Mansir said that she had been deceived. (*Id.*)

Plaintiff filed an Article 78 proceeding in the Supreme Court of the State of New York, County of Suffolk, claiming that the June 22 and September 14 removals were arbitrary and capricious and violated his

right to due process. (SS 56.1 ¶ 511.) Plaintiff voluntarily withdrew his claims with prejudice on March 27, 2012. (*Id.* ¶ 512.)

## B. Procedural History

Plaintiff commenced this action on May 23, 2012. He filed an amended complaint on August 10, 2012. Following discovery by the parties, all defendants filed motions for summary judgment on April 18, 21, and 22, 2014. Plaintiff served his opposition to the motions on June 18, 2014,[4] and defendants filed their replies on July 21, 2014. The Court heard oral argument on October 6, 2014. This matter is fully submitted, and the Court has fully considered all submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751

---

[4] Plaintiff did not file his opposition on ECF until July 18, 2014.

F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

Plaintiff alleges constitutional claims under 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To state a claim under Section 1983, a plaintiff must allege (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983.

The Court first considers the substance of each of plaintiff's constitutional claims under Section 1983. The Court then considers, as to each of the defendants in the case, whether there is a basis for liability for any of the alleged constitutional violations as to that particular defendant.

### A. Bill of Attainder

Plaintiff contends first that the two resolutions passed by the Town Board on June 18 and August 20, 2009 were unlawful bills of attainder. For the following reasons, this Court disagrees as a matter of law and grants summary judgment to all defendants on this claim.

### 1. Legal Standard

Article I, Section 10, Clause 1 of the United States Constitution states, in relevant part, "No State shall . . . pass any Bill of Attainder . . . ." U.S. Const. art. I, § 10, cl. 1. "A bill of attainder is a legislative act which inflicts punishment without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315 (1946) (quoting *Cummings v. Missouri*, 71 U.S. 277, 323 (1866)). The Supreme Court has articulated three elements of a bill of attainder: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 846–47 (1984).

"With respect to the existence *vel non* of punishment," the Second Circuit has identified the following three factors to consider:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment (historical test of punishment); (2) whether the statute, "viewed in terms of the type of severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes" (functional test of punishment); (3) whether the legislative record "evinces a [legislative] intent to punish" (motivational test of punishment).

*ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010) (quoting *Selective Serv. Sys.*, 468 U.S. at 853). These three factors "are the evidence that is weighed together in resolving the bill of attainder claim.'" *Id.* (quoting *Con Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 350 (2d Cir. 2002)). Moreover, "[h]owever expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant

of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 471 (1977). "Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences . . . ." *Id.* at 472–73.

### 2. Application

It is undisputed that the Town Board resolutions at issue specifically named plaintiff, and that the removals they directed occurred in the absence of a judicial trial. Whether the resolutions amounted to unconstitutional bills of attainder thus hinges upon whether the removals that they authorized amounted to "punishment" as that term has been defined in this context.

"The infamous history of bills of attainder is a useful starting point in the inquiry whether [an act] fairly can be characterized as a form of punishment leveled against [the plaintiff]." *Nixon*, 433 U.S. at 473. Examples of historical forms of punishment include death, imprisonment, banishment, "the punitive confiscation of property by the sovereign," and legislative enactment barring designated individuals or groups from participation in certain employment. *Id.* at 473–74. The Town Board resolutions did not impose such historical form of punishment on plaintiff. Importantly, even though plaintiff claims that the defendants confiscated valuable property in the two removals, the resolutions themselves authorized the removal of "litter." Legislative authorization to remove litter or any other public nuisance furthers a legitimate public purpose and is fundamentally different from the *punitive* confiscation of property that historically marked a bill of pains and penalties.

Importantly, the confiscation of property is not necessarily the *punitive* confiscation of property. *See, e.g.*, *Kadi v. Geithner*, No. CIV.A. 09-0108 JDB, --- F. Supp. 2d ----, 2012 WL 898778, at *35 (D.D.C. Mar. 19, 2012) (distinguishing "punitive confiscation of property" from blocking of property to further legitimate purpose of preventing terrorist activities). Indeed, recognizing the legitimate goal of abating public nuisances, at least two courts have held explicitly that the legislatively authorized abatement of a nuisance does not amount to an unconstitutional bill of attainder. *See, e.g.*, *Moore v. Commonwealth*, 168 S.W.2d 342, 342–44 (Ky. 1943) (citing cases); *People v. Casa Co.*, 169 P. 454, 457 (Cal. Ct. App. 1917). Accordingly, because the resolutions at issue directed only the removal of litter, they did not authorize the punitive confiscation of property and cannot be said to have imposed a historical form of punishment for these purposes.

Moreover, the Court concludes as a matter of law that the resolutions imposed no "grave imbalance or disproportion between the burden and the purported nonpunitive purpose," which would suggest that they meet the functional test of punishment. *See ACORN*, 618 F.3d at 138. Again, the Court emphasizes that the abatement of a public nuisance and the removal of litter are legitimate activities of a municipality. *Cf. Parker v. King*, No. 07-CV-624-WKW, 2008 WL 901087, at *14 (M.D. Ala. Mar. 31, 2008) ("The notification provisions of the Act are codified in the State's 'Health, Safety, and Housing Code,' § 18, confirming our conclusion that the statute was intended as a nonpunitive regulatory measure."). The resolutions simply required plaintiff to remove litter from his Property. Moreover, as defendants point out correctly, the resolutions at issue afforded plaintiff the opportunity to avoid the removals by

removing the "litter," as the Town Code defines that term. A burden that could have been alleviated by the plaintiff himself does not qualify as punishment under the functional test of punishment. *See, e.g.*, *Osuna v. Gov't Emps. Ins. Co.*, No. 11-CV-3631 (JFB)(AKT), 2012 WL 2888326, at *5 (E.D.N.Y. July 16, 2012).

Finally, given the record in this case (even construed most favorably to plaintiff), there is an insufficient basis to rationally find that the legislative record evinces an intent to punish. Plaintiff has simply failed to come forward with evidence reflecting "overwhelmingly a clear legislative intent to punish." *ACORN*, 618 F.3d at 141.[5] Absent such evidence, there is no factual basis to rationally find that the Town Board intended to punish plaintiff.

In sum, applying the three *ACORN* factors, the Court concludes there is no evidence to support a rational finding that the Town Board resolutions of June 18 and August 20, 2009 imposed "punishment" on plaintiff, as the term punishment has been narrowly defined in the bill of attainder context. Accordingly, the Court holds, as a matter of law, that the Town Board resolutions are not unlawful bills of attainder, and grants summary judgment to all defendants on this claim.

B. Procedural Due Process

Next, plaintiff maintains that defendants deprived him of his property without due process of law, in violation of the Fourteenth Amendment.[6] As set forth below, construing the evidence most favorably to plaintiff, the disputed factual issues in the record preclude summary judgment on the issue of whether plaintiff's due process rights were violated.

1. Legal Standard

To assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL–CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted). Notice and an opportunity to be heard are the hallmarks of due process. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Brody v. Vill. of Port Chester*, 434 F.3d 121, 131 (2d Cir. 2005) (holding that "if reasonable notice and opportunity for a hearing are given, due process will be satisfied").

Ordinarily, "'the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 115 (2d Cir.

---

[5] Although plaintiff asserts one Board member claimed to have received less than full information before the vote, and said she had been deceived, that evidence alone (even if credited) is insufficient to allow a rational finding that there was a clear legislative intent to punish.

[6] Plaintiff also invokes the Fifth Amendment; however, the Fifth Amendment guarantees due process by federal actors, and none of the defendants in the instant case are federal actors. Accordingly, plaintiff's due process claim is dismissed to the extent it relies on the Fifth Amendment. *See, e.g.*, *Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 333 (E.D.N.Y. 2010) (citing cases).

2006) (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)) (emphasis in original); *see also WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 50 (2d Cir. 2009) ("Due process requires that before state actors deprive a person of her property, they offer her a meaningful opportunity to be heard."). However, "'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Brody*, 434 F.3d at 134 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The familiar three-factor test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976)—balancing the private interest, risk of erroneous deprivation, and public interest—"provides guidance in determining whether to tolerate an exception to the rule requiring pre-deprivation notice and hearing." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (internal quotation marks and citations omitted). For instance, "[w]hen the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). Additionally, "in emergency situations a state may satisfy the requirements of procedural due process merely by making available 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.'" *WWBITV*, 589 F.3d at 50 (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)).

## 2. Application

As an initial matter, several individual defendants maintain that plaintiff has no standing to challenge the process he received before the removals because he pleaded guilty to violating Town Code § 167-12, thereby admitting that nuisance conditions existed on his property. (DSB Mem., at 9.[7]) In essence, those defendants would bar a plaintiff from alleging a procedural injury any time he later concedes the correctness of the decision to deprive him of his property. The Second Circuit expressly rejected this argument in *Brody v. Village of Port Chester*, holding that "[i]n a procedural due process challenge, the question before the court is whether the process affording the plaintiff an opportunity to participate in governmental decision-making before being deprived of his liberty or property was adequate, not whether the government's decision to deprive the plaintiff of such liberty or property was ultimately correct." 345 F.3d 103, 112 (2d Cir. 2003). Even if the government's decision was ultimately correct, nominal damages remain available to a plaintiff who establishes a violation of his procedural due process rights. *Id.* at 113; *see also Four K. Grp., Inc. v. NYCTL 2008-A Trust*, No. 12-CV-2135 (JG), 2013 WL 1562227, at *10 (E.D.N.Y. Apr. 15, 2013).

Next, the Town and several individual defendants contend that plaintiff was not deprived of any property rights because he has not shown that he owned the items seized in the two removals. (SS Mem., at 4.) To the contrary, plaintiff testified that he owned at least some of the vehicles seized during the first removal, such as the Ford flatbed tow truck. (*See* Ferreira Dep. at 217–18.) Plaintiff also testified that two-way radios, barbeques, hoses, rakes, hand tools, and ladders that he owned were taken as part

---

[7] "DSB Mem." and "DSB Reply" refer to the memorandum of law and reply memorandum of law submitted by Devitt Spellman Barrett, LLP on behalf of Schirrippa, Grenci, Narvilas, Jilnicki, and Glogg. "SS Mem." and "SS Reply" refer to the memorandum of law and reply memorandum of law submitted by Sokoloff Stern LLP on behalf of the Town, McGintee, Prince, Hammerle, and Loewen.

of the removals. (*See id.* at 397, 694–95). At the very least, there is a disputed issue of fact as to which seized property plaintiff owned, and summary judgment for defendants is not warranted on this basis.

Finally, defendants argue that the procedures afforded to plaintiff satisfied due process. In particular, pursuant to Town Code § 167-12, Town officials gave plaintiff ten days' notice before conducting both removals. It is uncontroverted that the Town did not provide for any pre-deprivation hearing, but defendants rely on *Castanza v. Town of Brookhaven* to argue that a pre-deprivation hearing is unnecessary in the context of nuisance abatement. *See* 700 F. Supp. 2d 277, 290 (E.D.N.Y. 2010) (concluding that removal of debris from plaintiff's property before providing plaintiff with opportunity to be heard did not violate due process).

As noted *supra*, where a plaintiff alleges a deprivation pursuant to an established state procedure, as is the case here, the state must ordinarily provide a pre-deprivation hearing. Contrary to defendants' argument and the *Castanza* decision, this Court does not conclude that there is anything inherently different about nuisance abatement that would automatically excuse the state from affording a pre-deprivation hearing in all cases. *See, e.g.*, *Kness v. City of Kenosha, Wis.*, 669 F. Supp. 1484, 1494 (E.D. Wis. 1987) ("Section 7.126 of the Code of General Ordinances, even in conjunction with Chapter 68, Wis. Stats., does not provide any opportunity for a hearing prior to the towing of nuisance vehicles from private property. Therefore, the ordinance violates due process."); *cf. Rudge v. City of Stuart*, 489 F. App'x 387, 389 (11th Cir. 2012) (per curiam) ("The City's October 2009 notice to abate the nuisance warned Rudge that he had ten days to remedy violations of specific ordinances, or the City

would enter his property and do it for him. Thus, the City gave Rudge notice of the action it intended to take. *More importantly, the October 2009 notice gave Rudge an opportunity to appeal that decision. The City thus gave Rudge an opportunity to be heard.* Therefore, by the time the City filed its complaint for an ex parte injunction, it had already granted Rudge adequate notice and opportunity to be heard." (emphasis added)). Such a holding would run afoul of the general rule requiring a pre-deprivation hearing.[8]

The existence of an emergency may, however, excuse the need to provide a pre-deprivation hearing. *See, e.g.*, *Catanzaro v. Weiden*, 188 F.3d 56, 63–64 (2d Cir. 1999) (holding that pre-deprivation hearing was unnecessary before demolition of damaged building that public official reasonably believed to be an "immediate danger" to the public). Indeed, the emergency justification for withholding a pre-deprivation hearing has applied to nuisance abatement actions. *See, e.g.*, *Wyss v. City of Hoquiam*, 111 F. App'x 449, 450 (9th Cir. 2004) ("When immediate action is necessary to protect the public interest, such as when an unsafe nuisance is present, a hearing is not necessary prior to the exercise of police power as long as adequate post-deprivation procedural safeguards exist."); *Trobough v. City of Martinsburg*, 120 F.3d 262, 1997

---

[8] At oral argument, counsel for defendants also relied upon *Livant v. Clifton*, 334 F. Supp. 2d 321 (E.D.N.Y. 2004), for the proposition that no pre-deprivation procedure was necessary in this case. *Livant*, which addressed only the adequacy of notice, *see id.* at 325–26, is inapposite here. Moreover, the Court notes that, on appeal, the Second Circuit held that the plaintiff had actually alleged "a constitutional violation of his procedural due process right to receive adequate notice." *See Livant v. Clifton*, 272 F. App'x 113, 116 (2d Cir. 2008) (summary order). The Court discusses *Livant* further in connection with plaintiff's Fourth Amendment claim.

WL 425688, at *3 (4th Cir. 1997) (Table) ("In situations where a government must act to protect its citizens from a nuisance, the availability of a prompt hearing, subsequent to the action satisfies the demands of due process."); *Brancato v. City of New York*, 244 F. Supp. 2d 239, 246 (S.D.N.Y. 2003) ("The existence of a public nuisance is a grave enough concern that the state need not necessarily, in all instances, provide a pre-deprivation notice and hearing before abating the nuisance itself and assessing the costs against the property involved." (citing *Lawton v. Steele*, 152 U.S. 133, 136 (1894))). However, an emergency situation is an exception to the general rule requiring a pre-deprivation hearing. *See, e.g.*, *WWBITV*, 589 F.3d at 50 ("Where there is an emergency requiring quick action and where meaningful pre-deprivation process would be impractical, the government is relieved of *its usual obligation to provide a hearing*, as long as there is an adequate procedure in place to assess the propriety of the deprivation afterwards." (emphasis added)).

Of course, the mere invocation of an emergency does not excuse the state from affording a pre-deprivation hearing to one of its citizens. Nonetheless, the Second Circuit gives government officials some degree of deference in declaring an emergency. In *Catanzaro*, the Second Circuit explained that "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion." *Id.* at 63. "Whether the official abused his discretion or acted arbitrarily in concluding that a genuine emergency exists is a factual issue, subject to the usual considerations for a

district court addressing a summary judgment motion." *WWBITV*, 589 F.3d at 51.

Synthesizing the authority cited *supra*, this Court concludes that the existence of a public nuisance may excuse the failure to hold a pre-deprivation hearing if there was competent evidence allowing an official to believe reasonably that an emergency did in fact exist, and the official did not abuse her discretion in invoking an emergency. Absent such evidence, however, the failure to afford a pre-deprivation hearing would constitute a violation of the constitutional right to procedural due process in this case. *See Burtnieks v. City of New York*, 716 F.2d 982, 987–89 (2d Cir. 1983).

In the instant case, there is a disputed issue of fact as to whether the defendants acted arbitrarily in deciding that the conditions on the Property posed an immediate danger to the public. Importantly, it is uncontroverted that the Town and its officials knew about the conditions on the Property for years before taking action in the summer of 2009. The existence of a significant delay between recognition of a supposed emergency and the act to remedy that condition could, *inter alia*, support a reasonable finding that the Town officials acted arbitrarily in declaring the conditions on the Property to be an immediate danger to the public. For instance, in *Burtnieks*, the Second Circuit held that a three-month delay between the declaration of an emergency and the demolition of the offending building created a genuine issue as to whether an emergency had existed. 716 F.2d at 988. Accordingly, the Second Circuit reversed the district court's grant of summary judgment on the plaintiff's procedural due process claim. *See id.* at 989. More recently, in *WWBITV*, the Second Circuit reaffirmed that the delay between declaring an emergency and remedying that condition

creates a genuine "dispute concerning the town officials' reasonable belief that there was a need to take emergency action." 589 F.3d at 51–52 (distinguishing *Burtnieks* from *Catanzaro* on grounds that *Burtnieks* involved three month delay before demolition whereas *Catanzaro* concerned a situation with no delay between recognition of the emergency and demolition). Based upon the evidence in the record in this case, there are genuine issues of disputed fact that preclude summary judgment as to whether plaintiff was deprived of his property without due process of law. [9] The Court examines the defendants' respective liability for this alleged constitutional violation *infra*.[10]

## C. Fourth Amendment

Plaintiff also maintains that the defendants violated his right to be free from unreasonable searches and seizures in entering the Property without a warrant and removing his personal property. For the reasons that follow, the Court concludes that there are genuine issues of disputed fact that preclude summary judgment on the Fourth Amendment claim under Section 1983.

### 1. Legal Standard

The Fourth Amendment of the United States Constitution provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley v. California*, 573 U.S. ---, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 71 (1992) (reaffirming that "reasonableness is still the ultimate standard under the Fourth Amendment" (internal citation and quotation marks omitted)). "Absent more precise guidance from the founding era, [the Supreme Court] generally determine[s] whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Riley*, 134 S. Ct. at 2484 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

The law is unclear as to whether a warrant is required to enter private property

---

[9] Plaintiff also appears to advance a procedural due process claim based upon Narvilas's request to plaintiff's attorney to delay the filing of an order to show cause just before the first removal. However, there is no evidence that Narvilas's request was disingenuous, and even if it were, plaintiff's attorney consented to it. Thus, this claim is meritless. Similarly, whether or not the Town Board meetings violated the New York Open Meetings Law, as plaintiff claims they did, would not support a separate procedural due process claim. *See Lilly v. Lewiston-Porter Cent. Sch. Dist.*, 853 F. Supp. 2d 346, 360 (W.D.N.Y. 2011).

[10] At oral argument, counsel for the Town suggested that the Town had afforded plaintiff pre-deprivation process in the Town Justice Court. The Court disagrees. Critically, as noted *supra*, the Town initiated the two removals *before* plaintiff's scheduled trial date in the Town Justice Court. In other words, the Town proceeded with the removals before plaintiff had his day in the Town Justice Court. These circumstances support, rather than undermine, plaintiff's procedural due process claim.

in order to abate a public nuisance. Nonetheless, as an initial matter, it is well settled that government actors are not exempt from the warrant requirement merely because they are looking for violations of a fire or housing code instead of the fruits or instrumentalities of a crime. In *Camara v. Municipal Court of City and County of San Francisco*, the Supreme Court recognized that the administrative search of an apartment by a city inspector for possible violations of the city housing code constituted a "significant intrusion[] upon the interests protected by the Fourth Amendment," and thus held "that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual." 387 U.S. 523, 534 (1967). In so holding, *Camara* overruled *Frank v. Maryland*, 359 U.S. 360 (1959), which had upheld the warrantless inspection of private property to locate and abate a suspected public nuisance. *See Camara*, 387 U.S. at 528–29 (describing *Frank* and overruling that decision "to the extent that it sanctioned such warrantless searches").

In *Michigan v. Tyler*, the Supreme Court reaffirmed the principle that "the Fourth Amendment extends beyond the paradigmatic entry into a private dwelling by a law enforcement officer in search of the fruits or instrumentalities of crime." *See* 436 U.S. 499, 504 (1978). In *Tyler*, the Court further explained, in relevant part:

> The officials may be health, fire, or building inspectors. Their purpose may be to locate and abate a suspected public nuisance, or simply to perform a routine periodic inspection. The privacy that is invaded may be sheltered by the walls of a warehouse or other commercial establishment not open to the public. These deviations from the typical police search are thus clearly within the protection of the Fourth Amendment.

*Id.* at 504–05 (internal citations omitted).

Building on this statement in *Tyler*, the Ninth Circuit has concluded that "[e]ntry to abate a known nuisance falls within the warrant requirement of the fourth amendment." *Conner v. City of Santa Ana*, 897 F.2d 1487, 1490 (9th Cir. 1990). There, the Ninth Circuit confronted a situation similar to the instant case: the Santa Ana City Council determined that automobiles on the plaintiffs' property constituted a public nuisance and, without a warrant and without plaintiffs' permission, removed those automobiles from the plaintiffs' property. *See id.* at 1489. The Ninth Circuit held that *Tyler* required a warrant in those circumstances, determining that *Tyler* could not be distinguished "on the ground that it endorses a warrant requirement only for abatement of *suspected* nuisances." *Id.* at 1490 (emphasis added). This decision prompted a strong dissent, which noted that no case, federal or state, directly supports the proposition that a judicial warrant is required whenever government actors enter private property to abate an established nuisance. *See id.* at 1496 (Trott, J., dissenting).

All other federal Courts of Appeals to have considered the issue have held that government actors need not obtain a warrant before abating an established public nuisance. For instance, the Fifth Circuit has held that "[a] warrant is unnecessary when a municipality seizes property that has been declared a nuisance by means of established police power procedures." *Freeman v. City of Dallas*, 242 F.3d 642, 644–45 (5th Cir. 2001) (en banc). In reaching this conclusion, the Fifth Circuit distinguished *Camara* and

*Tyler*, which addressed searches "to gather evidence of regulatory noncompliance," from the seizure of property already determined to be a nuisance pursuant to procedures that satisfy due process. *See id.* at 650–52. The Sixth, Eighth, and Tenth Circuits have likewise rejected the Ninth Circuit's warrant requirement to abate a public nuisance. *See Santana v. City of Tulsa*, 359 F.3d 1241, 1245 (10th Cir. 2004); *Embassy Realty Invs., Inc. v. City of Cleveland*, --- F. App'x ----, No. 13-4300, 2014 WL 3376900, at *5 (6th Cir. July 10, 2014); *Samuels v. Meriwether*, 94 F.3d 1163, 1168 (8th Cir. 1996).

The Second Circuit has not clearly weighed in on this issue. However, in holding that government actors enjoyed qualified immunity for conducting a warrantless abatement of a public nuisance, the Second Circuit has held that *Tyler* did not clearly establish a warrant requirement to abate a nuisance. *See Livant*, 272 F. App'x at 115 n.1. *Livant* thus provides at least some indication that the Second Circuit disagrees with the Ninth Circuit's more expansive reading of *Tyler*. In addition, several district court decisions in this Circuit have held that a warrant is not required for a municipality to abate a nuisance. *See Castanza*, 700 F. Supp. 2d at 288 (holding that Town did not need warrant to enter property and abate nuisance); *Livant*, 334 F. Supp. 2d at 324–25 (holding that municipality may summarily abate a nuisance, and that Town's resolution to abate nuisance was "a constitutionally adequate substitute for a judicial warrant"); *Brancato*, 244 F. Supp. 2d at 246 (noting that state police power includes ability to abate whatever may be regarded as public nuisance by summary proceedings (citing *Lawton*, 152 U.S. at 136)).

After considering all sources discussed *supra*, this Court concludes that a municipality need not necessarily obtain a warrant to enter private property in order to abate a public nuisance. In particular, this Court finds persuasive the decisions of the Fifth, Sixth, Eighth, and Tenth Circuits, and rejects the Ninth Circuit's rigid insistence on a warrant in all cases of nuisance abatement. Supreme Court precedent does not compel the use of a warrant to abate a nuisance, and the Court cannot conclude that a warrant would be required in these circumstances given the state's well-established ability to abate a public nuisance by summary proceeding. *See Lawton*, 152 U.S. at 136.

Although the Court concludes that a warrant is not required to abate a public nuisance, the seizure of property considered to be a public nuisance, as well as the entry onto private property to accomplish that seizure, must still be reasonable to comply with the Fourth Amendment. *See, e.g.*, *Soldal*, 506 U.S. at 71. For this reason, to the extent the district court decisions in *Castanza* and *Livant* hold that the summary abatement of a nuisance can *never* violate the Fourth Amendment, this Court disagrees. Instead, the Court finds persuasive the decisions of the Fifth, Sixth, Eighth, and Tenth Circuits in balancing the governmental and private interests involved in the seizure of nuisance property. In striking this balance, the Fifth Circuit has recognized that "[r]egulation of nuisance properties is at the heart of the municipal police power," and that a municipality's adherence to standards comporting with due process "suggests the Fourth Amendment reasonableness" of the abatement. *Freeman*, 242 F.3d at 652–53. The Tenth Circuit has reached a similar conclusion, holding that "as long as procedural due process standards are met and no municipal actions are shown, a nuisance abatement action does not violate the Fourth Amendment." *Santana v. City of Tulsa*, 359 F.3d 1241, 1245 (10th Cir. 2004). The Sixth and Eighth Circuits have

held similarly, as well. *See Embassy Realty Invs., Inc. v. City of Cleveland*, 572 F. App'x 339, 345 (6th Cir. 2014) ("Barnes had been afforded adequate due process relating to the condemnation proceedings and, therefore, the warrantless entrance on the Property to remediate the established nuisance was reasonable under the Fourth Amendment."); *Samuels v. Meriwether*, 94 F.3d 1163, 1168 (8th Cir. 1996) (holding that "an abatement carried out in accordance with procedural due process is reasonable in the absence of any factors that outweigh governmental interests").

## 2. Application

At the outset, for the reasons discussed *supra* with respect to plaintiff's procedural due process claim, the Court rejects the defendants' argument that plaintiff lacks standing to bring a Fourth Amendment claim because he did not own the items seized during the two removals.

Moreover, there is a genuine issue of fact in this case as to whether the Town and its agents afforded plaintiff due process. *See supra*. At this juncture, because the Court cannot conclude as a matter of law that defendants accomplished a nuisance abatement in conformity with due process, the Court also cannot conclude as a matter of law that the search and seizure of plaintiff's property was reasonable. In other words, if a jury found that Town officials abused their discretion by taking plaintiff's private property without holding a pre-deprivation hearing in a non-emergency situation, those facts could also support a reasonable conclusion that the Town and its agents acted unreasonably within the meaning of the Fourth Amendment. *See Freeman*, 242 F.3d at 652–53; *Santana*, 359 F.3d at 1245; *Embassy Realty Invs.*, 572 F. App'x at 345; *Samuels*, 94 F.3d at 1168.

Finally, disputes over other material facts preclude this Court from holding as a matter of law that the search and seizure of plaintiff's property complied with the Fourth Amendment. In particular, as discussed *supra*, there is a dispute as to whether the Town's agents destroyed plaintiff's property or merely confiscated it. Moreover, plaintiff testified that the Town's agents removed items that were clearly not "litter" or a public nuisance, such as his tools. Thus, there is a genuine dispute as to material facts bearing on whether the searches and seizures were effectuated in an unreasonable manner, in violation of the Fourth Amendment. *See, e.g., Lauro v. Charles*, 219 F.3d 202, 211 (2d Cir. 2000) (noting that "the reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out" (internal citation, quotation marks, and brackets omitted)). In other words, if plaintiff's evidence is credited and all reasonable inferences are drawn in his favor, a rational jury could find that plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures was violated during the two removals. Accordingly, summary judgment on the Fourth Amendment claim is unwarranted.

## D. Substantive Due Process

Plaintiff also argues that defendants infringed upon his substantive due process rights by removing his property, including his repair tools, during the two removals. (*See* Pl.'s Opp'n, at 19–21.) Because this claim is covered by the Fourth Amendment, the Court grants summary judgment to all defendants as to plaintiff's separate substantive due process claim. *See, e.g., Tenenbaum v. Williams*, 193 F.3d 581, 600

(2d Cir. 1999) ("Substantive due process analysis is therefore inappropriate in this case if the claim is covered by the Fourth Amendment. As discussed below, Sarah's removal and her examination constituted a seizure and search, respectively, under the Fourth Amendment and the Tenenbaums have standing to assert a Fourth Amendment-based claim against the defendants on Sarah's behalf. Their claim on Sarah's behalf therefore must be analyzed under the standard appropriate to the Fourth Amendment, not under the rubric of substantive due process. We affirm the dismissal of the substantive due-process claim brought on Sarah's behalf on this ground." (internal brackets, citations, and quotation marks omitted)); *see also Pabon v. Wright*, 459 F.3d 241, 252–53 (2d Cir. 2006) ("If a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal citations and quotation marks omitted)).

### E. Equal Protection

Finally, plaintiff asserts a class-of-one equal protection claim. As set forth below, even construing the evidence most favorably to plaintiff, no rational jury could find an equal protection violation in this case, and the Court grants summary judgment for all defendants on this claim.

### 1. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *see also Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per

curiam) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." (citations omitted)). In *Prestopnik v. Whelan*, the Second Circuit explained the difference between class-of-one equal protection claims and more traditional equal protection claims:

> The Equal Protection Clause requires that the government treat all similarly situated people alike. While this clause is most commonly used to bring claims alleging discrimination based on membership in a protected class, it may also be used to bring a "class of one" equal protection claim. In a "class of one" case, the plaintiff uses the existence of persons in similar circumstances who received more favorable treatment than the plaintiff to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose— whether personal or otherwise—is all but certain.

249 F. App'x 210, 212–13 (2d Cir. 2007) (summary order) (internal alterations, citations, and quotation marks omitted). In particular, as the Court sets forth below, in order to prevail on a class of one claim, a plaintiff must demonstrate that (1) he was treated differently from a similarly situated individual, and (2) the differential treatment was arbitrary and irrational.

First, in order to succeed on a class-of-one claim, a plaintiffs must demonstrate that he was "treated differently than someone

who is *prima facie* identical in all relevant respects." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005) (internal citation and quotation marks omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). "This requires a showing that the level of similarity between the plaintiff and the person(s) with whom she compares herself is 'extremely high'— so high (1) that 'no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy,' and (2) that 'the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" *Prestopnik*, 249 F. App'x at 213 (quoting *Neilson*, 409 F.3d at 104–05). "This showing is more stringent than that used at the summary judgment stage in the employment discrimination context . . . because the existence of persons in similar circumstances who received more favorable treatment than the plaintiff in a class-of-one case is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (internal citation and quotation marks omitted).

Although the determination of whether parties are similarly situated is generally a "fact-intensive inquiry," "[a] court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Id.*; *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010) (affirming dismissal of class-of-one

claim when plaintiffs' comparators were not similar to plaintiffs, "let alone so similar that no rational person could see them as different"); *Neilson*, 409 F.3d at 106 (holding that, despite a jury's verdict in plaintiff's favor, no rational jury could have concluded that plaintiff and the comparators were similar enough to support a class-of-one claim); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 135 (D. Conn. 2010) (granting defendants' motion for summary judgment where plaintiff admitted that she was unaware of any other similarly situated individuals).

Second, a plaintiff must prove that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Olech*, 528 U.S. at 564) (internal quotation marks omitted). It is not sufficient that the act itself be intentional; instead, a plaintiff must demonstrate that "the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Id.* at 143; *see also Morningside Supermarket Corp. v. N.Y. State Dep't of Health*, 432 F. Supp. 2d 334, 341 (S.D.N.Y. 2006) ("A plaintiff must . . . establish . . . that the irrational disparate treatment was intentional, that is, that the defendants 'knew' they were treating the plaintiff differently from everyone else." (quoting *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001))).

Courts, including the Second Circuit, have repeatedly cautioned about the danger of ordinary disputes between a citizen and a municipality—whether it be about land use, licenses, inspections, or some other regulatory or investigative function of local governments—being transformed into federal lawsuits by an incorrect, over-expansive theory of class-of-one liability.

*See Bizzaro v. Miranda*, 394 F.3d 82, 88–89 (2d Cir. 2005) ("*Olech* does not empower federal courts to review government actions for correctness. Rather, an *Olech*-type equal protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of their agency."); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) ("Courts have understood that if class-of-one claims are not defined appropriately, they might turn many ordinary and inevitable mistakes by government officials into constitutional violations and federal lawsuits."); *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216–17 (10th Cir. 2011) ("We have approached class-of-one claims with caution, wary of turning even quotidian exercises of government discretion into constitutional causes. . . . These concerns are magnified with challenges to low-level government decision-making, which often involves a great deal of discretion. The latitude afforded police officers, . . . zoning officials, and other similar government actors necessarily results in a sizeable amount of random variation in outcome. If even innocuous inconsistencies gave rise to equal protection litigation, government action would be paralyzed." (internal citations and quotation marks omitted)); *Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n*, 610 F.3d 8, 16 (1st Cir. 2010) ("Drawing distinctions is what legislators and regulators do every day: without this comparability sieve, every routine governmental decision at the state and local level—of which there are millions every year—could become a class-of-one case in federal court."); *Cordi-Allen v. Conlon*, 494 F.3d 245, 252 (1st Cir. 2007) ("The burden that a class of one plaintiff must carry at the summary judgment stage is considerably heavier than a mere showing that others have applied, with more auspicious results, for the same benefit that

he seeks. . . . Were the law otherwise, the federal court would be transmogrified into a super-charged version of a local zoning board—a zoning board on steroids, as it were."); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1009 (7th Cir. 2004) ("Even if [plaintiff] was wronged here, we do not believe that he has shown the wrong to be discriminatory in nature. Every time an actor commits a tort, he may be treating the victim differently than he frequently treats others, simply because tortious conduct is by nature a departure from some norm. Nonetheless, the purpose of entertaining a 'class on one' equal protection claim is not to criminalize all tort law nor to transform every claim for improper provision of municipal services or for improper conduct of an investigation in connection with them into a federal case." (citations omitted)).

## 2. Application

Plaintiff's amended complaint alleged that his Property was similarly situated to other registered auto repair shops operating in the Town, but that none of those shops were subject to the actions taken against plaintiff. (*See* Am. Compl. ¶ 259.) He also claimed that he was treated differently from similarly situated individuals facing criminal charges for violations of the Town Code. (*See id.* ¶ 261.) In his opposition papers, plaintiff has identified the following, specific properties, which he claims were similarly situated to his own: the Town Police's impound yard; Uihlein Boat Yard; and T&B Auto, an auto repair shop in Amagansett. (*See* Pl.'s Opp'n, at 21–22; *see also* Horn Aff.) Essentially, plaintiff asserts that vehicles are stored outside on these properties for long periods of time without interference by the Town. (*See* Pl.'s Opp'n, at 21–22.)

Even construing the evidence most favorably to plaintiff, no rational trier of fact

could conclude on this record that the properties cited by plaintiff were identical in all relevant respects to the Property. The only evidence offered by plaintiff are pictures purporting to show that the Town tacitly condones the presence of vehicles outdoors on these properties for long periods of time. As defendants point out, however, there are several crucial differences between those properties and plaintiff's. First, T&B Auto operates a repair shop in the "Neighborhood Business" zone of the Town, which allows the use of repair shops. (Preiato Supp. Aff. ¶ 3.) Uihlein Boat Yard performs boat repair and storage in the "Waterfront" commercial district, which permits such use. (*Id.* ¶ 4.) The Town Police's impound yard falls within the "Commercial Industrial" zone, which permits the use of storage garages and recycling/scrap yards. (*Id.* ¶ 5.) Crucially, there is no evidence that T&B Auto, Uihlein Boat Yard, or the Town Police's impound yard have ever been in violation of the Town Code or New York State law. By contrast, plaintiff has conceded that the condition of his Property over the years has been in repeated violation of the Town Code and New York State law. Thus, even construing the evidence most favorably to plaintiff, no rational jury could find that plaintiff has provided sufficient evidence of similarly situated individuals in order to establish a class-of-one equal protection claim. *See, e.g.*, *Clubside*, 468 F.3d at 159 (noting stringent standard of similarity necessary to establish class-of-one equal protection claim).

### F. Liability of Specific Defendants

Although the Court concludes that a reasonable jury could find violations of plaintiff's procedural due process and Fourth Amendment rights, there are a number of arguments that have been asserted by particular defendants as to why

that they cannot be held liable for those alleged violations, if the jury were to find such violations occurred. The Court considers these arguments below.

### 1. Municipal Liability

First, as noted *supra*, plaintiff has sued the Town itself. A municipal entity may be held liable under Section 1983 only where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal policy or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). In other words, a municipality can be held liable only if the municipality itself commits a wrong; "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.*; *see, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (citing *Monell*, 436 U.S. at 691) (internal quotation marks omitted). In addition, a municipal policy or custom may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern*, 93 F.3d at 44).

In the instant case, the Town argues that it is entitled to summary judgment because there is no evidence of a Town policy or custom that caused the asserted constitutional violations. The Court disagrees. The actions about which plaintiff complains were taken pursuant to resolutions passed by the Town Board acting in accordance with the Town Code. The direct involvement of the Town Board in these actions suffices to establish a municipal policy giving rise to liability under *Monell* if plaintiff can establish that the actions were unconstitutional. *See, e.g.*, *New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.*, No. 99-CV-460A(F), 2004 WL 1498190, at *62 (W.D.N.Y. July 2, 2004) ("Town boards and town supervisors are considered municipal policy makers for purposes of imposing § 1983 liability against a town."), *aff'd*, 164 F. App'x 5 (2d Cir. 2005); *see also Wiltzius v. Town of New Milford*, 453 F. Supp. 2d 421, 436 (D. Conn. 2006) (noting that "official policy may be established by legislative enactments or by municipal boards to whom government officials have delegated the requisite authority" (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Thus, the Court denies the Town's motion for summary judgment on this basis.

### 2. Official Capacity

Second, plaintiff brings claims against the individual defendants in their official capacities as agents of the Town. "'[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 283–84 (E.D.N.Y. 2010) (quoting *Monell*, 436 U.S. at 690 n.55); *see also Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (noting that "a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself"); *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010) ("The suit against the mayor and police chief in their official capacities is essentially a suit against the City of Schenectady, because in a suit against a public entity, naming officials of the public entity in their official capacities adds nothing to the suit." (internal citations and quotation marks omitted)). Accordingly, where a plaintiff brings claims against both a municipality and individuals in their official capacities as agents of that municipality, "'courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources.'" *Castanza*, 700 F. Supp. 2d at 284 (quoting *Escobar v. City of New York*, No. 05-CV-3030-ENV-CLP, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007)).

In the instant case, the individual defendants have moved for summary judgment as to all claims against them in their official capacities. Because the Town is named as a defendant in the instant case, the Court grants summary judgment as to all claims for the individual defendants in their official capacities.

### 3. Legislative Immunity

Third, defendants Prince, Hammerle, Loewen, and Mansir—members of the Town Board during the relevant time span—and McGintee—the Town supervisor who voted for the resolutions—move for summary judgment on the basis of legislative immunity. "Legislators are entitled to absolute immunity from civil liability for their legislative activities." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003). In *Bogan v. Scott-Harris*, the Supreme Court extended legislative immunity to local legislators sued

under § 1983. *See* 523 U.S. 44, 49 (1998) ("[W]e now hold that local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities."). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54.

Here, the Court concludes as a matter of law that Prince, Hammerle, Loewen, McGintee, and Mansir are entitled to summary judgment on this basis. Voting for the June 18 and August 20, 2009 resolutions constituted their only involvement in the asserted procedural due process and Fourth Amendment violations. Because their acts of voting for a resolution directing the removal of litter were clearly legislative in nature, they are entitled to legislative immunity from liability for plaintiff's claims. Thus, the Court grants summary judgment for Prince, Hammerle, Loewen, McGintee, and Mansir as to plaintiff's procedural due process and Fourth Amendment claims.

### 4. Prosecutorial Immunity

Defendants Narvilas, Jilnicki, Schirrippa, and Glogg assert absolute prosecutorial immunity. The Court concludes that they are not entitled to prosecutorial immunity for plaintiff's remaining procedural due process and Fourth Amendment claims.

It is well settled that individuals enjoy absolute immunity from liability in suits seeking monetary damages for acts carried out in their prosecutorial capacities, *i.e.*, those acts "intimately associated with the judicial phase of the criminal process," but not for "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976); *see, e.g.*,

*Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). "In determining whether absolute immunity obtains, [the Second Circuit] appl[ies] a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" *Id.* at 661 (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). For example, the Second Circuit has held that absolute immunity extends to a prosecutor's "'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information,'" even where the prosecutor knowingly prosecutes an innocent person. *Shmueli*, 424 F.3d at 237–38 (quoting *Imbler*, 424 U.S. at 431 n.34). Relevant for purposes of the instant case, the "[i]nitiation of a nuisance abatement proceeding is a quasi-prosecutorial function" that is protected by absolute immunity. *Sherwyn Toppin Mktg. Consultants, Inc. v. Gluck*, No. 11-CV-3951 (MKB), 2012 WL 4364490, at *4–5 (E.D.N.Y. Sept. 25, 2012) (citing *Pinter v. City of New York*, 710 F. Supp. 2d 408, 419–20 (S.D.N.Y. 2010), *rev'd on other grounds*, 448 F. App'x 99 (2d. Cir. 2011)); *accord Cooper v. Parrish*, 203 F.3d 937 (6th Cir. 2000) (holding that absolute immunity protects prosecutor for initiating civil public nuisance action).

Plaintiff argues that absolute immunity does not shield Narvilas, Jilnicki, Schirrippa, and Glogg from liability here. In the instant case, plaintiff complains that the defendants, including Narvilas, Jilnicki, Schirrippa, and Glogg, acted outside the judicial process to orchestrate the removal of his property. In other words, unlike those cases granting absolute immunity to individuals for

initiating judicial proceedings for nuisance abatement, plaintiff's procedural due process and Fourth Amendment claims do not concern the judicial proceedings against him in the Town Justice Court. In contrast, the defendants contend that they are entitled to absolute immunity even for actions taken outside judicial proceedings because they were exercising their power to enforce the Town Code. (*See* DSB Reply, at 3.) However, the Court need not decide this issue because (as discussed below), even if absolutely immunity did not apply, qualified immunity clearly bars the claims against the initial defendants.

### 5. Qualified Immunity

Finally, Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci assert the defense of qualified immunity. It is well established that government actors are immune from suit for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). "A right is clearly established if the law (1) was 'defined with reasonable clarity,' (2) has been affirmed by 'the Supreme Court or the Second Circuit[,]' and (3) where the conduct at issue would have been understood by a reasonable defendant to be unlawful under the existing law." *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (quoting *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)); *see also Ashcroft v. al-Kidd*, 563 U.S. ----, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Thus, the question is not whether a right is clearly established as a general proposition; rather, the Supreme Court has emphasized that "[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Therefore, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Under this standard, Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci are entitled to qualified immunity on plaintiff's procedural due process claim. Although this Court has held that plaintiff was entitled to a pre-deprivation hearing absent an emergency situation, the law is unsettled as to whether a pre-deprivation hearing is _ever_ necessary before abating a public nuisance.[11] First, Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci could have justifiably relied upon the Town Code itself, which requires ten days' notice but no pre-deprivation hearing before removing litter from an individual's property. Moreover, the *Castanza* decision held that a town's failure to a conduct a hearing before removing litter from the plaintiff's property "did not deprive Plaintiff of due process of law." 700 F. Supp. 2d at 290. *Castanza*, a decision from this judicial district, relied upon *4M Holding Co. v. Town Board of Town of Islip*, a New York Appellate Division decision that held that a

---

[11] Given that the Court concludes that, even accepting the plaintiff's version of the facts, the due process right was not clearly established in the context of this case, the factual disputes regarding whether or not the right was violated do not preclude summary judgment as to the individual defendants. The same is true for the Fourth Amendment claim.

town board's "failure to notify the petitioner or to conduct an adversarial hearing prior to the adoption of the resolution" authorizing the town to enter the petitioner's property and remove debris did not violate procedural due process. 586 N.Y.S.2d 286, 287 (N.Y. App. Div. 1992), *aff'd*, 81 N.Y.2d 1053 (1993). In light of this conflicting authority, the Court concludes that the due process rights that Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci are alleged to have violated – in connection with the removals of plaintiff's property without affording plaintiff a pre-deprivation hearing – were not clearly established at the time of their actions.

As the Supreme Court has noted, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999); *see also Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364, 379 (2009) ("We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagree about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt that we were sufficiently clear in the prior statement of law. We conclude that qualified immunity is warranted."); *Zieper v. Metzinger*, 474 F.3d 60, 71 (2d Cir. 2007) ("the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'") (internal quotations and citations omitted)); *Moorman v. Thalacker*, 83 F.3d 970, 974 (8th Cir.1996) ("The law of 'attempt' is complex and fraught with intricacies and doctrinal divergences. Qualified immunity protects prison officials from liability for their objectively reasonable efforts to divine whether a course of conduct amounts to an 'attempt,' even should their answer be arguably wrong.").

In short, given the lack of clarity in the courts on whether a pre-deprivation hearing is ever necessary before abatement of a public nuisance, qualified immunity as to the individual defendants on the procedural due process claim is warranted. Based upon language in the above-referenced cases, although the right to be free from a violation of due process was clearly established as a general proposition, it would not be clear to a reasonable official that his conduct was unlawful in the situation confronted in this particular case involving abatement of a nuisance. Thus, this Court cannot say that, in the light of pre-existing law, the unlawfulness of the conduct was apparent. *See Anderson*, 483 U.S. at 640. Accordingly, the individual defendants are entitled to summary judgment because they are immune from suit for the due process claims against them.

Moreover, Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci are entitled to qualified immunity from plaintiff's Fourth Amendment claim. As an initial matter, even if the Court were incorrect concerning the requirement of a warrant to abate a public nuisance, these defendants would enjoy qualified immunity for their failure to obtain a warrant authorizing the removals. *See Livant*, 272 F. App'x at 115 ("Even if Livant has alleged a violation of his right to be free from unreasonable searches and seizures, the Town Officials Defendants' actions did not violate any 'clearly established' rights because there was no authority establishing a Fourth Amendment requirement for

municipalities to obtain a warrant to abate a nuisance."). In addition, to the extent a reasonable jury could find the searches and seizures unreasonable because defendants did not afford plaintiff procedural due process, these defendants are entitled to qualified immunity for the reasons discussed *supra* with respect to plaintiff's procedural due process claim. Finally, plaintiff also claims that the manner of the searches and seizures violated his Fourth Amendment rights. As noted *supra*, plaintiff bases this aspect of his Fourth Amendment claim on the disputed facts concerning the property taken and whether it included items, such as his tools, that were not "litter" within the meaning of the Town Code or otherwise a public nuisance. However, there is no evidence that Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci had any involvement in deciding what property was taken, or any other control over how the removals were conducted.

Accordingly, the Court grants summary judgment for Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci as to plaintiff's procedural due process and Fourth Amendment claims on the basis of qualified immunity.

## IV. CONCLUSION

For the reasons set forth herein, the Court grants in part and denies in part the defendants' motions for summary judgment. Specifically, summary judgment is warranted on plaintiff's bill of attainder, substantive due process, and equal protection claims, but his procedural due process and Fourth Amendment claims survive summary judgment. However, these claims survive only against the Town because defendants Prince, Hammerle, Loewen, McGintee, and Mansir are entitled to absolute legislative immunity from liability on these claims, and defendants Narvilas, Jilnicki, Schirrippa, Glogg, and Grenci are entitled to qualified immunity. Accordingly, summary judgment is granted for defendants on all claims with the exception of the procedural due process and Fourth Amendment claims under Section 1983 against the Town.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: November 4, 2014
       Central Islip, NY

\*      \*      \*

Plaintiff is represented by Lawrence E. Kelly, 11 Cedar Bay Court, Bayport, NY 11705. Defendants the Town, McGintee, Prince, Hammerle, and Loewen are represented by Brian S. Sokoloff and Mark A. Radi of Sokoloff Stern LLP, 179 Westbury Avenue, Carle Place, NY 11514. Defendants Schirrippa, Narvilas, Jilnicki, Glogg, and Grenci are represented by Anne C. Leahey, David H. Arntsen, John M. Shields, and Kelly E Wright of Devitt Spellman Barrett, LLP, 50 Route 111, Smithtown, NY 11787. Defendant Mansir is represented by Keith V. Tola, Rondiene Erin Novitz, and Scott Ira Gurtman of Cruser Mitchell & Novitz LLP, 341 Conklin Street, Second Floor, Farmingdale, NY 11735.